Pitney v. Bolton.

MARTIN PITNEY

v.

JOHN L. BOLTON and THE CAMDEN AND ATLANTIC RAIL-ROAD COMPANY.

1. A parol declaration of trust of personal property is valid.

2. If a transaction is equally capable of two constructions, one lawful and the other unlawful, the former will be adopted, especially as against a person who was a party to it equal in guilt with the other, and who is seeking to gain an advantage by having it declared unlawful.

2. A and B, owners in common of certain chattels, united in transferring them to C to hold in trust for them as tenants in common. There were reasons of convenience sufficient to account for the transfer as to both; but, in addition to those reasons, B was indebted and intended by the transfer to prevent, temporarily, his creditors from reaching his interest in the property transferred.—*Held*, that, in the absence of satisfactory evidence that A supposed or intended that his joining in the transaction would tend to aid B in his unlawful project, the trust was valid and would be enforced in favor of A against C.

On final hearing on bill, answer and proofs.

*Mr. S. W. Sparks*, for the complainant.

*Mr. E. B. Leaming*, and *Mr. Davis*, of Philadelphia, for the defendant Bolton.

PITNEY, V. C.

This is a bill, by a party claiming to be a *cestui que trust*, asking for a transfer to him of the property entrusted, which con-

sists of certain shares of the capital stock of the Camden and Atlantic Railroad Company.

The facts of the case, as I gather them from the pleadings, proofs and the statements and admissions of counsel at the hearing, are as follows : Dr. Jonathan Pitney, of Absecom, Atlantic county, died in 1869 possessed of ninety-four shares of preferred stock and ten shares of common stock, in all one hundred and four shares, of the corporation defendant, standing in his name. He was also possessed of other personal property and of considerable real estate in that county. By his will he gave the use of all his property to his wife Caroline for life, and, at her death, to his two sons, Dr. Jonathan Kay Pitney, commonly called "Kay," and Martin Pitney, the complainant, and appointed the Honorable John Clement and testator's wife executor and executrix thereof. These shares of stock remained standing in the testator's name until the death of the widow, which occurred February 24th, 1882. At that time Kay Pitney was indebted to one Abbott, who held a judgment against him. Martin, the complainant, was free from debt. The defendant Bolton was an officer or employe of the defendant corporation in its office in Philadelphia, where he resided. Both he and his wife, as stated by his counsel, were very old, intimate and confidential friends of the Pitney family, and went down to the family residence at Absecom as guests the day after the widow died, and remained there, as friends, until the funeral, which took place on the 28th of February. Judge Clement, the executor, was also present. Between the time of the death and the funeral, the condition of the property, into the possession of which the two sons would now come, and the liability of Kay's share of it to be reached by proceedings on the Abbott judgment, was the subject of conversation between Bolton and his wife and the Pitney brothers, and it seems to have been supposed by the brothers that it could be so reached. After the funeral, Kay Pitney proposed that the shares should be transferred in a block to Bolton to hold in trust for the brothers, the object being, so far as Kay's own one-half was concerned, to make it more difficult for the judgment creditor to reach his interest in it, for the time being, and until he could

settle with the creditor.   Just why Martin's one-half should be and was included in the transfer is not so clear, and will be considered further on.   Martin assented to Kay's request, and the transfer was made as follows : The original certificates of stock were produced, having on their back the usual blank powers of attorney for transfer; these blank powers were then signed by Kay and Martin ; no filling in of the blanks was done either at that or any other time, and Bolton's name does appear in them. Afterwards, on the 7th of March, 1882, Judge Clement, as surviving executor of Jonathan Pitney, executed several and separate deeds of transfer of the certificates to Bolton, stating on their face that they were made at the request of Kay and Martin, and under those deeds Bolton afterwards procured the shares to be transferred to himself.   Half of them in number, viz., forty-seven preferred and five of the common, he has since sold, and accounted for the proceeds to Kay Pitney.   The judgment against Kay has been paid and satisfied.   Of the other one-half belonging to Martin, he (Bolton) in 1886 purchased from him the absolute title to fifteen shares, paying therefor by conveying to him (Martin) a tract of land in Atlantic county ; and Martin swears that Bolton also paid to him (Martin) the dividends declared from time to time on the whole fifty-two shares up to within two or three years.   This, however, Bolton denies.   When asked by Martin to make further payments to him, he (Bolton) declined on the sole ground, as Martin swears, that Kay was considerably indebted to him (Bolton), and he would not transfer the shares until that indebtedness was paid.   This Bolton does not deny.

In his answer, and at the argument, he denied any agreement on his part to hold the stock in trust for anybody, and sets up that the object of its transfer to him was to hinder and delay the judgment creditor of Kay Pitney ; and that if there were any trust for retransfer it was an unlawful one, and such as this court will not enforce ; and hence he is entitled to hold the shares as his own.   His counsel said that there were certain family reasons which justified him in taking this stand.

41

It was not alleged or pretended that Martin Pitney had any creditors who were or could be delayed by the transfer in question.

The defence was set forth in the answer as follows:

"That the sole and only purpose and object of the said complainant, Martin Pitney, and the said J. K. Pitney, in causing the said transfer of said stock was to delay, hinder and defraud the said judgment creditor of the said J. K. Pitney in the collection of his said judgment; and the said complainant, Martin Pitney, counseled with the said J. K. Pitney and joined the said J. K. Pitney in the execution of said power of attorney and causing the said transfer of said stock for the sole and express purpose of assisting the said J. K. Pitney in defrauding said judgment creditor."

And, in the argument, that the act of transfer to Bolton was the single joint act of both brothers, with a single object and purpose on the part of both, which was unlawful, and that Martin cannot now separate and divide the transaction into two independent parts, one only of which shall be unlawful, and the other lawful and innocent. That the result is that the transfer, so far as Martin is concerned, must be considered and treated in equity as having been made for the purpose of defrauding Kay's judgment creditor.

No decided cases in favor of this proposition were cited by the evidently industrious counsel who represented the defendant, but reliance was had on that class of cases where parties had loaned money or other valuables to be used by the borrower in unlawful and forbidden enterprises, such as lotteries, gambling, the slave trade, contraband trade and the like, in which enterprises, however, the lender takes no part, but, nevertheless, is not permitted to recover back the money or property so lent; and it was contended that the principle of those cases applies here.

As to the alleged solidarity, so to speak, and indivisibility of the so-called joint transfer, I am unable to follow the counsel, for reasons which will hereafter appear, and I therefore think that, in order to maintain his position, the defendant must satisfy the court that the joining by Martin in the so-called powers of attorney to transfer, and in the request to Judge Clement to transfer, the stock to Bolton, was intended to have the effect, and

would naturally tend to have the effect, of aiding Kay to hinder and thereby defraud his creditor. As this is, in effect, a charge of positive and actual fraud against Martin, it must be proven, and is not to be lightly inferred. If the transaction be equally capable of two constructions—one innocent and the other unlawful—the familiar rule is, that the innocent one will be adopted, especially as against a person who stands, on his own confession, without the least merit, and who seeks to make gain by a fraudulent transaction in which he knowingly participated.

While the rule upon which defendant bases this part of his defence—expressed in the maxim *in pari delicto potior est conditio possidentis*—is a wholesome one, and will be observed in all cases clearly within its terms, yet our courts do not appear to have manifested any disposition to extend it by construction, or to apply it to cases not clearly brought within its reach.

I think this is manifest from a consideration of the cases of *Ownes* v. *Ownes, 8 C. E. Gr. 60; McVay* v. *McVay, 16 Stew. Eq. 47,* in this court; and of *Marlatt* v. *Warwick, 4 C. E. Gr. 439,* and *Ruckman* v. *Ruckman, 6 Stew. Eq. 354,* in the court of appeals; and see *Bowes* v. *Foster, 2 Hurlst. & N. 779.*

Perhaps this indisposition is accounted for by the fact that our innate sense of justice is always gratified when we find the rules of equity, as applied to any particular case, squaring themselves with what is honorable and just between man and man.

A striking illustration of this is found in *Davis* v. *Graves, 29 Barb. 480,* which was an action brought by a receiver, appointed in supplemental proceedings upon a judgment, to set aside a conveyance made by the judgment debtor to his brother just prior to the recovery of the judgment, on the ground that the same was without consideration and void. The answer sets up that the premises were originally conveyed to the present judgment debtor by his present grantee (his brother) without consideration and in trust to reconvey the same, the same being done on account of the embarrassed circumstances of the original grantor and present grantee; and that the present judgment debtor, who occupied the position of a fraudulent grantee of the property, had, before the judgment against him was recovered,

reconveyed it to the original fraudulent grantor, in execution of the trust upon which it had been originally conveyed. Judgment was rendered in favor of the defendant, and of the transaction Judge E. Darwin Smith makes this remark : "He [the fraudulent grantee] was under no *legal* obligation to make such conveyance, but he was under a *high moral and equitable obligation to do so.* And the law is not so unjust that it will deny to men the right, while it is in their power to do so, to recognize and fulfill their obligations of honor and good faith. Until the creditors of Daniel Graves [the fraudulent grantee] had acquired liens upon this land, they had no legal or equitable claims in respect to it higher than, or superior to, those of Jacob Graves."

The only way in which I can conceive that the transfer of the stock in a block to Bolton could have the effect claimed for it by the defendant, would be by investing the whole transaction with a greater appearance of reality and rendering it more likely to deceive Kay's creditor. Except in that way, it is difficult for me to conceive how the transfer by A of his own undivided part interest in certain property to B can tend to hinder, delay or defeat the creditors of C, who owns the other undivided interest therein.

Let us look a little more closely at the situation and circumstances. The title of the shares of stock was not in Kay or Martin, or either of them, either at law or in equity, and hence they were not subject to levy and could not be reached as stock, directly, by any proceedings which could be had in any court upon the judgment. I state this to be the situation, because the case does not show that there was a specific bequest of these shares to the sons, but the contrary, viz., a bequest only of the residue of the testator's real and personal estate, of which the shares formed a part, to be equally divided between the two sons. Title to the shares therefore stood, at first, in both executors, and after the death of the widow, in Judge Clement as survivor; and that this was the real situation, was further manifest from the fact that Judge Clement actually made the transfer. If the shares were, in point of law, subject to levy after the death of the widow, they were also so subject before her death ; that event

did not change their status; and, as it appears that Kay's judgment creditor was watchful, had he even supposed them to be so subject to levy, they would in all probability have been levied upon before her death. The remedy of the creditor was not in that direction, but rather by proceedings either at law supplemental to the execution, or in this court to reach Kay's interest in his father's estate, as a chattel not subject to levy.

The signatures of the two sons to the blank powers of attorney on the back of the certificates were entirely inefficient to work a transfer, and could and did take effect only as a request to Judge Clement to make it. A sale and transfer of the stock *in solido* by the judge, as executor, was the usual and natural thing for him to do in settling up the estate. As before remarked, the shares were never subject to execution as against either of the brothers, and the transfer by the judge did not of itself tend to hinder, delay or defraud creditors. On the contrary, it seems to me that it had, if any, the contrary effect, and tended rather to render them subject to levy, or, at least, more easily reached by the execution creditor. The precise right of the sons, under their father's will, was to have the personalty converted into money and divided between them as such. But as to these shares of stock, which were capable of equal division, either son might, upon paying his share of the expenses, and so forth, instead of insisting upon a sale, elect to have one-half transferred to him either directly or to his nominee, such transfer operating as a payment to him on account of his share in the estate. If the transfer was made to a nominee in trust for himself, then the share would become his property and the subject of direct attack by an execution creditor. In the case in hand the natural source of information for a creditor looking for property to satisfy his debt was Judge Clement, and upon inquiring of him he would have learned that a transfer had been made to Bolton without other consideration than such indebtedness as Bolton may have held against Kay, and that he (Bolton) held one-half of the shares in trust for Kay, and thus, such of the shares as belonged to Kay would have been rendered subject to attack by the creditor.

The foregoing view of the nature of the several interests of the sons in their father's estate disposes, as it seems to me, of the notion of the indivisibility of the so-called act of transfer on their part. What they each did was simply, each on his own account, to elect to take one-half of the number of shares in specie instead of the proceeds in money.

Here, then, it seems to me, a material part of the defendant's case fails. The act of transfer by Judge Clement to Bolton did not necessarily or naturally tend to hinder the creditors.

Still, it is said that the brothers did not so think, but, on the contrary, had the impression that the transfer would, in some way, aid Kay in keeping off his creditor until he could make a favorable settlement with him, and that the affair must be considered in that light. Admitting all this, the question still remains, Did Martin join in directing Judge Clement to transfer the stock, all together, to Bolton, for the purpose of aiding Kay in his project, and did he think it would have that effect in the manner hereinbefore stated, viz., by investing the affair with a greater air of reality? Presumably, Judge Clement desired to be rid of further responsibility; and on all accounts it was highly proper, if not necessary, that the stock should be transferred to somebody. It might be divided at once, and one-half transferred to each, or it might be kept all together in the name of a friend whom both could trust, who could collect the dividends, and who could sell and transfer at the direction of either. Bolton was such a man. He was an old and intimate friend of the family. He was in the railroad company's office. He was so situated as to be able to watch the market for a favorable moment to sell, and when found, could, with the stock standing in his name, make immediate transfer. In the meantime he could collect and remit the dividends. It was said that the stock might as well be transferred all together, and that it would save trouble and expense; and it was further suggested that it would be a kindness to Bolton, and give him greater strength and standing with the company to have some stock standing in his name. These were reasons sufficient of themselves to account for the transfer being made in the manner it was, without the

additional reason that operated in Kay's case; and I am satisfied they did so operate in Martin's case; and the evidence fails to satisfy me that he thought that his joining in the transaction would give it any greater show of validity as against his brother's creditor, or that he intended that it should have that effect. For myself, I do not see how, under the circumstances of this case, it would necessarily or naturally have that effect.

On this part of the case, I think that the defendant must fail.

Defendant's counsel further contended that there is evidence of a conspiracy between Kay and Martin to hinder and delay Kay's creditor, and that Martin is equally guilty, and therefore loses his standing in this court. But what was to be done under that conspiracy? Simply to put Kay's property beyond the reach of Kay's creditor. As to Martin's property, it was not within the reach of Kay's creditor, and Martin had none, and complainant is not asking to have Kay's property retransferred to him, but simply his own; and he says, and I think truly, that the transfer of his property was not a necessary part and parcel of the transfer of Kay's, and so was not within the scope of the object of the conspiracy.

The other point, namely, the denial that there was any trust declared by the defendant, need occupy but little attention. Both Martin and Kay swear that Bolton expressly promised at the time of the transfer to hold the stock in trust for them—one-half for each; and the circumstances show that such must have been the understanding of all parties. Then we have the subsequent conduct of Bolton—first, in accounting to Kay for his share; next, in paying Martin dividends; then, in buying part of the shares from him; and then, in trying to hold the balance, not on the ground that there was no trust, but on the ground that Kay owed him other moneys. The language in which his denial of the trust in his answer is clothed, is not sufficiently broad to be satisfactory. His denial on the witness-stand is more sweeping; but, under the circumstances, I believe the brothers as against the defendant.

A parol declaration of trust is valid. *Hooper* v. *Holmes, 3 Stock. 122; 1 Perry Trusts § 88* and cases cited.

I will advise a decree that Bolton transfer to the complainant thirty-two shares of preferred stock and five shares of common stock of the defendant's railroad, and that there be a reference to a master to take and state an account, upon the usual terms, of the dividends received by him on account of the shares from the time of their transfer to him, in March, 1882.